2007 OK CIV APP 51

**LIBERTARIAN POLITICAL ORGANIZATION OF OKLAHOMA, f/k/a Libertarian Political Party of Oklahoma; Steve Galpin; Robert T. Murphy; Sharon Lynn Atherton; Roger Bloxham; Richard P. Prawdzienski; Michael A. Clem; and Christopher S. Powell, Plaintiffs/Appellants,**

v.

**Michael CLINGMAN, Secretary of the Oklahoma State Election Board; Glo Henley, Chairman of the Oklahoma State Election Board; Kenneth Monroe, Vice–Chairman of the Oklahoma State Election Board; Thomas E. Prince, Member of the Oklahoma State Election Board; and the Oklahoma State Election Board, Defendants/Appellees.**

No. 103,592.

Court of Civil Appeals of Oklahoma, Division No. 4.

Feb. 27, 2007.

Certiorari Denied May 14, 2007.

James C. Linger, Tulsa, Oklahoma, for Plaintiffs/Appellants.

Honorable Drew Edmondson, Attorney General, M. Daniel Weitman, Gregory Thomas Metcalfe, Assistant Attorneys General, Oklahoma City, Oklahoma, for Defendants/Appellees.

DOUG GABBARD II, Presiding Judge.

¶1 Plaintiffs, the Libertarian Political Organization of Oklahoma (LPO), and various individual members and/or officers of LPO, seek review of a summary judgment order in favor of Defendants, the Oklahoma State Election Board and its officers or members (OSEB), on Plaintiffs' claim that Oklahoma's ballot access laws regarding formation and recognition of a political party are unconstitutional. We affirm.

## BACKGROUND FACTS

¶2 On May 1, 2003, LPO filed its notice of intent with the OSEB to form a new Oklahoma political party by petition pursuant to 26 O.S.2001 § 1–108.[1] On April 30, 2004, the last day before the May 1, 2004, deadline, LPO filed a petition for registration containing 26,462 signatures. This was half the number of signatures required for recognition (51,781) based upon the total votes cast in the last general election, and represented only 1.3% of all registered voters (1,938,377) in Oklahoma as of January 2004. Most of the signatures were obtained between February and April 2004. In fact, only 4,500 of the signatures were obtained during the first nine months of the petition drive. Although LPO later claimed that this occurred due to voter apathy, it admitted that the organization did not attempt to collect signatures on many days during this period because of inclement weather, petitioning demands in other states, or harassment of LPO workers.

¶3 Three weeks before LPO's § 1–108 petition was filed, Plaintiffs initiated the present lawsuit seeking recognition as a political party. Plaintiffs claimed they had been unable to comply with Oklahoma's requirements concerning formation of political parties primarily because the state's ballot access requirements were unduly restrictive and in violation of the Oklahoma and U.S. Constitutions. Specifically, Plaintiffs asserted state law required them to collect an

unduly burdensome number of voter signatures on the petition, all within too short a period of time. Plaintiffs sought a judgment declaring § 1–108 unconstitutional, and an injunction prohibiting OSEB from enforcing the statute against Plaintiffs and all similarly situated individuals.

¶4 OSEB denied that Plaintiffs were entitled to the requested relief, and asserted that § 1–108 was constitutional as written and applied. OSEB also alleged that LPO failed to obtain the necessary signatures because of a lack of effort and a lack of appeal to the electorate. OSEB noted that there were only 455 registered Libertarian voters in Oklahoma in January 2004, and Libertarian Party candidates had never received significant voting percentages: the party's 1980 candidate received only 1.2% of the total vote, its 1996 candidate received .46% of the total vote, and its 2000 candidate received only 5.36% of the vote.

¶5 In June 2004, the trial court denied Plaintiffs' request for a temporary injunction. In March 2006, OSEB moved for summary judgment based upon a decision by the U.S. Court of Appeals for the Tenth Circuit in *Rainbow Coalition of Oklahoma v. Oklahoma State Election Board*, 844 F.2d 740 (10th Cir.1988). In that decision, the federal appellate court found that Oklahoma's ballot access and voter registration laws were constitutional. OSEB argued that Oklahoma law had changed in only minor respects since the *Rainbow Coalition* decision, and that the Tenth Circuit's reasoning still applied. The trial court agreed and granted OSEB's motion, finding the matter "is controlled by *Rainbow Coalition v. Oklahoma State Election Board.*"

¶6 Plaintiffs now appeal.[2] In their petition in error, they contend that the trial court improperly considered *Rainbow Coalition* to be controlling, and that the evidence shows § 1–108 imposes an unconstitutional curtailment on associational freedoms and

---

1. Section 1–108 has been amended twice since the date of LPO's original notice: first, by Okla. Sess. Laws 2003, SB 358, c. 485, § 1 (effective August 29, 2003); and second, by Okla. Sess. Laws 2004, HB 2677, c. 53, § 6 (emerg. effective April 1, 2004).

2. The present appeal was not at issue and assigned to this court until September 2006.

acts, essentially "so as to freeze the political status quo." In its response, OSEB argues that Oklahoma's ballot access laws "raise no barriers to ballot access to reasonably diligent minority parties," and that the state's interests in assuring orderly elections, protecting absentee voters, manageable ballots, "an unconfused electorate," and the elimination of "frivolous candidacies" outweigh the burden placed on minority parties by § 1–108.

## STANDARD OF REVIEW

■ ¶ 7 The granting of a summary judgment upon undisputed material facts presents an issue of law and, therefore, requires a *de novo* review. *Neil Acquisition, L.L.C. v. Wingrod Inv. Corp.*, 1996 OK 125, ¶ 5, 932 P.2d 1100, 1103. "An appellate court claims for itself plenary, independent and non-deferential authority to re-examine a trial court's legal rulings." *Id.* at n. 1; *see also Salve Regina College v. Russell*, 499 U.S. 225, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991).

## ANALYSIS

■ ¶ 8 The right to vote, the right to be associated with a political party, and the right to be a political candidate are important and valuable rights in our democracy. *Burdick v. Takushi*, 504 U.S. 428, 433, 112 S.Ct. 2059, 2063, 119 L.Ed.2d 245 (1992). However, these rights are not absolute. "[A]s a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Storer v. Brown*, 415 U.S. 724, 730, 94 S.Ct. 1274, 1279, 39 L.Ed.2d 714 (1974).

¶ 9 In *Anderson v. Celebrezze*, 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983), the U.S. Supreme Court set forth the following "balancing of interests" test to be used in analyzing constitutional challenges to state election laws:

[A] court must resolve such a challenge by an analytical process that parallels its work in ordinary litigation. It must first

consider that character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which these interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.

*Id.* at 789, 103 S.Ct. at 1570; *see also Burdick*, 504 U.S. at 434, 112 S.Ct. at 2063; *Tashjian v. Republican Party*, 479 U.S. 208, 107 S.Ct. 544, 93 L.Ed.2d 514 (1986).

■ ¶ 10 Strict scrutiny is not an absolute requirement in reviewing a ballot access challenge. However, even when strict scrutiny is not applicable, citizens have a fundamental interest in creating and developing political parties, and, to the extent that a state would thwart this interest, the state must demonstrate a corresponding interest "sufficiently weighty to justify the limitation." *Norman v. Reed*, 502 U.S. 279, 289, 112 S.Ct. 698, 705, 116 L.Ed.2d 711 (1992).[3] Strict scrutiny appears to be the applicable standard only when "the challenged restriction *unfairly or unnecessarily burdens 'the availability of political opportunity.'*" *Anderson*, 460 U.S. at 793, 103 S.Ct. at 1572 (emphasis added) (quoting *Clements v. Fashing*, 457 U.S. 957, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1982)).

¶ 11 In this case, the challenged statute, 26 O.S. Supp.2006 § 1–108, provides that a group of persons wishing to form a new political party must first file a notice of intent with the OSEB, followed by petitions "bearing the signatures of registered voters equal to at least five percent (5%) of the total votes cast in the last General Election either for Governor or for electors for President and Vice President." The petitions may be circulated a maximum of one year after the notice

---

3. The Oklahoma Supreme Court essentially adopted the *Anderson* test in *Sharp v. Tulsa County Election Board*, 1994 OK 104, ¶¶ 17–22, 890 P.2d 836, 842–43.

is filed, and must be filed with the OSEB "no later than May 1 of an even-numbered year." The OSEB then has 30 days to determine the validity of the signatures.[4]

¶ 12 Declarations of candidacy as the nominee of a party must be filed between the first Monday in June and the next succeeding Wednesday of even numbered years, 26 O.S. Supp.2006 § 5–110, and contests of any candidacy must be filed by 5 p.m. of the second day following the close of the filing period, 26 O.S.2001 § 5–119. A primary election by which recognized political parties nominate their candidates is held on the last Tuesday in July of even-numbered years, 26 O.S. Supp.2006 § 1–102; and a runoff primary, if needed, is to be held on the fourth Tuesday of August in the same year, 26 O.S. Supp. 2006 § 1–103.[5] Oklahoma uses a semi-closed primary system that only allows registered members of a political party and registered independents to vote in a primary election. General elections are always held on the first Tuesday after the first Monday in November in even-numbered years, 26 O.S.2001 § 1–101. A recognized party whose nominee for governor or for presidential electors does not receive at least ten percent of the total votes cast in a general election, ceases to be a recognized party. 26 O.S.2001 § 1–109 (A).

¶ 13 Prior to August 2003, state law provided for filing the signature petitions no later than May 31 but was in all other respects the same as it is currently—i.e., it allowed the proposed party one year to circulate petitions to gather the required number of signatures.[6] Prior to 2003, the law also provided for primary and runoff election dates which were one month later than they are currently; candidacy filing periods also were one month later than provided in current law. *See* 26 O.S. Supp.2006 §§ 1–102, 1–103 and 5–110.[7] Thus, the time period between the petition filing deadline, signature verification deadline, and declarations of candidacy dates remains roughly *the same* as it was prior to August 2003, i.e., around 30 to 35 days (May 1 to the first Monday in June); and the time period between the petition filing deadline and the first primary election remains roughly *the same*, i.e., around 85 days, with the first 30 days devoted to signature verification by the OSEB.

¶ 14 The pre-August 2003 version of § 1–108 was unsuccessfully challenged by LPO and others in the 1988 *Rainbow Coalition* case. There, as here, the plaintiffs claimed the deadline was too early in the election year and that the five-percent signature requirement was too onerous and difficult to achieve within the time period allowed. Essentially, the plaintiffs claimed that the law unconstitutionally interfered with their rights, under the Oklahoma Constitution and the First and Fourteenth Amendments to the U.S. Constitution, to associate as individuals for advancement of their political beliefs, and with their right as qualified voters to cast their votes effectively.

¶ 15 Noting that the validity of restrictions upon constitutional rights depends upon whether the restrictions are necessary to further a compelling state interest, the Tenth Circuit held that the five-percent requirement was "undeniably constitutional." 844 F.2d at 744. Although the Court found the state's May 31 filing deadline more trouble-

---

**4.** Candidates may file for the nomination of a political party in the state only if the party has been recognized by the laws of Oklahoma, 26 O.S.2001 § 5–104.

**5.** Though not at issue in the instant action, the state also conducts a "presidential preference primary" for recognized political parties on the first Tuesday in February of the years in which the president and vice president of the United States are to be elected. 26 O.S. Supp.2006 § 20–101. However, the names of nominees for president by political parties which are not recognized under state law may be placed on the ballot in a presidential election year by following the procedure set forth in 26 O.S.2001 § 10–

101.2, which provides for a July 15 deadline (in the election year) by which petitions signed by the requisite number of registered voters supporting the nominee's candidacy must be filed.

**6.** Prior to 1984, independent parties only had 90 days to circulate the petition. This law was held unconstitutional in *Libertarian Party of Oklahoma v. Oklahoma State Election Board,* 593 F.Supp. 118 (W.D.Okla.1984).

**7.** As noted in the text, under current law, declarations of candidacy must be filed the first Monday, Tuesday, or Wednesday in June. 26 O.S. Supp.2006 § 5–110. Prior to 2003, such filing periods occurred in July.

some due to how early in the election cycle it occurred,[8] it ultimately agreed with the state that the date was not *unreasonably* early. The Court refused to apply a strict scrutiny analysis, and found the Oklahoma statute constitutional. *Id.* at 743–47.

¶ 16 In the present appeal, Plaintiffs argue that Oklahoma law has changed since the *Rainbow Coalition* decision, and that, in any event, state courts are not bound by the holding of the lower federal appellate courts. *See Bogart v. CapRock Comm. Corp.*, 2003 OK 38, ¶ 13, 69 P.3d 266, 271; *Akin v. Missouri Pac. Ry. Co.*, 1998 OK 102, ¶ 30, 977 P.2d 1040, 1052. Although both arguments are correct, we find the statutory changes since *Rainbow Coalition* inconsequential, and, while not controlling, the Tenth Circuit decision is "highly persuasive" authority. *Dority v. Green Country Castings Corp.*, 1986 OK 67, n. 24, 727 P.2d 1355, 1360. Moreover, our independent analysis of the Oklahoma statute leads us to the same conclusion reached by the Tenth Circuit in *Rainbow*.

¶ 17 Under *Anderson*, the first step in analyzing an election law is the consideration of the character and magnitude of the asserted injury to the rights that the plaintiffs seek to vindicate. Here, Plaintiffs claim that the questioned law unconstitutionally infringes upon their associational rights under the Oklahoma Constitution and the First and Fourteenth Amendments to the U.S. Constitution. When such claims are raised, the U.S. Supreme Court has examined such factors as whether alternative means are available to exercise those rights, the effect of the regulations on the voters, the candidates, and the parties, and evidence of the restrictions' real impact on the election process.

¶ 18 Restrictions that do not affect a political party's ability to perform its primary functions of organizing, developing, or recruiting supporters, choosing a candidate, or voting for that candidate in a general election have been held not to impose a severe burden. *See Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 117 S.Ct. 1364, 137 L.Ed.2d 589 (1997) (laws which prohibited an individual from appearing on the ballot as the candidate for more than one party are valid); *Burdick v. Takushi*, 504 U.S. 428, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992) (an election system which prohibits write-in candidates is valid); *Clingman v. Beaver*, 544 U.S. 581, 125 S.Ct. 2029, 161 L.Ed.2d 920 (2005) (Oklahoma's semi-closed primary system that only allows registered members of the party and registered independents to vote in a primary election is valid). Here, the Oklahoma law does not regulate or restrict LPO's internal processes, its authority to exclude unwanted members, its capacity to communicate with the public, its ability to associate with non-members, its ability to nominate its candidates, or its ability to engage in the same activities as every other political organization in the state.[9]

¶ 19 However, because the Oklahoma statute restricts an unrecognized party's ability to appear on the general election ballot, its effect must be carefully examined. In that regard, LPO claims that the statute has a substantial effect upon its associational rights, as shown by the following historical "facts":

(1) In 2004, Oklahoma allegedly was the only state that had no other political party choices on its presidential ballot besides the Republican and Democrat parties.

8. Problems which other courts have noted with filing deadlines far in advance of the primary and general elections focus on the fact that early deadlines may hinder minor parties' collection of signatures at a time "when the election is remote and voters are generally uninterested in the campaign," when media attention is less focused on the election and related issues, and "at a time when the major party candidates are not known and when the populace is not politically energized." *Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 586 (6th Cir.2006)(citing *Council of Alternative Political Parties v. Hooks*, 121 F.3d 876, 880 (3d Cir.1997), and *McLain v. Meier*, 637 F.2d 1159, 1163–64 (8th Cir.1980)).

9. Such restrictions on political parties were found unconstitutional in the following cases: *NAACP v. Alabama ex. rel. Patterson*, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958); *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982); *NAACP v. Button*, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); *Keyishian v. Bd. of Regents*, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967).

(2) When no other parties besides the two major parties appear, there is no possibility of voting for a candidate other than a Republican or Democrat for president since Oklahoma does not permit "write-in" voting, per 26 O.S.2001 § 7–127 (1).

(3) Most other states require a political party to obtain signatures equivalent to 2.5% or less of the total number of voters; and in 2004 and 2006, Oklahoma's five-percent requirement translated to petition signature requirements of, respectively, 51,781 and 73,188 registered voters. Plaintiffs argue they could only collect 26,462 petition signatures prior to April 30, 2004, because of Oklahoma's earlier filing deadline, the "shortened time during the more politically active periods for petitioning," petitioning demands in other states, harassment of petitioners while petitioning, and poor weather conditions.

(4) From 1945 to 1975, only one group, the American Party (in 1968), succeeded in meeting the Oklahoma requirements pertaining to petition signatures (this was during a time period when the law required that 5,000 signatures be obtained).

(5) Since 1975, when § 1–108 was enacted (implementing the five-percent requirement), no new party has successfully formed in a gubernatorial election year due to the higher number of voters participating in the previous general election.

(6) Since 1975, in presidential election years, the only new parties which have successfully petitioned to be recognized are the Reform Party, in 1996 and 2000, and the Libertarian Party, in 1980, 1996, and 2000. The Libertarian Party failed in its petition drives in 1976, 1981, 1984, and 1993–94; although it was successful in 1988 and 1992 in placing the name of the national party's presidential candidate on the ballot pursuant to 26 O.S.2001 § 10–101.2.

¶ 20 Even if we accept all these allegations as true, they do not support Plaintiff's argument that Oklahoma's ballot access laws are *unreasonably* restrictive, severe, or discriminatory: *First*, the fact that Oklahoma was the only state without minority parties on the ballot in 2004 does not prove that the questioned law is unduly restrictive, since this fact could also be explained by LPO's failure to present candidates and a platform that captured the interest of prospective voters. *Second*, the U.S. Supreme Court has held that laws prohibiting write-in candidates on ballots are not presumptively unconstitutional. *See Burdick v. Takushi*, 504 U.S. at 436–37, 112 S.Ct. at 2064–65; *see also Coalition for Free and Open Elections v. McElderry*, 48 F.3d 493 (10th Cir.1995)(Oklahoma's write-in prohibition is presumptively valid). *Third*, although many other states only have a 2.5% signature requirement for such petitions, the U.S. Supreme Court has approved a five-percent requirement that was even more restrictive than Oklahoma's. *See Jenness v. Fortson*, 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971), where the Court approved an election law requiring petitions to contain the signatures of five percent of all registered voters (not *actual* voters as the Oklahoma law requires) to be collected within 180 days (instead of one year). *Fourth*, the historical data does not prove that LPO has had an insufficient opportunity to be placed upon the ballot by using the petition procedure. The U.S. Supreme Court has generally been unimpressed with such arguments when other candidates or the same party have previously been successful using the same procedure. *See American Party of Texas v. White*, 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974). Here, the Libertarian Party has been able to place the name of its presidential candidate on the ballot, using essentially the same procedure as is now set forth in 26 O.S.2001 § 10–101.2, on two previous occasions. *Fifth*, the evidentiary material *affirmatively* suggests that LPO did not make reasonable efforts to collect the required signatures. As indicated above, LPO made little effort to collect signatures prior to February and March 2004. Although LPO claims that additional efforts would have been futile because of a lack of voter interest, its own expert admitted that, at least as to presidential candidates, there is significant interest in elections as early as January in an election year. In fact, Oklahoma's February presidential preference primary, with all of its attendant media attention and public focus, is

suggestive of *increased* voter interest during this period.

¶ 21 Because Oklahoma law allows one year for circulating petitions, does not restrict voters to signing only one petition, and schedules the candidate filing period relatively soon after the petition filing deadline, we agree with the Tenth Circuit's decision in *Rainbow Coalition.* Neither the time period for gathering signatures nor the number of signatures required, place an *unreasonable* or *severe* burden upon LPO's associational rights to the extent that a "strict scrutiny" review is applicable. Accordingly, when a state election law, such as this one, places only minor barriers between a voter and a party, the state's important regulatory interests will usually be enough to justify reasonable, non-discriminatory restrictions on parties, elections, and ballots "to reduce election- and campaign-related disorder." *Clingman,* 544 U.S. at 581, 125 S.Ct. at 2031.

■ ¶ 22 Analyzing whether the state's justifications for the law constitute important regulatory interests is the second step of the *Anderson* test. In this case, OSEB suggests two primary justifications: *First,* OSEB argues that the relevant deadlines are mandated by the Oklahoma election schedule, and are necessary to provide enough time for verifying the petition signatures before the primary candidate filing period, and to allow challenges to the candidates. *Second,* OSEB contends the state's interest in an orderly election process allows it to require that proposed new political parties demonstrate that they have a modicum of support before being allowed on the ballot.

¶ 23 In addressing the first justification, the U.S. Supreme Court has acknowledged that some cut-off period is necessary to verify the validity of signatures, to print the ballots, and, if necessary, to litigate candidate challenges. *American Party of Texas,* 415 U.S. at 786, 94 S.Ct. at 1308. *Rainbow Coalition* held that the Oklahoma law was

justified by this state interest, since an even more restrictive election scheme had already been found constitutional by the U.S. Supreme Court in *Jenness.* We agree. The Oklahoma statute provides a reasonable, orderly, and efficient means of allowing unrecognized parties access to the general election ballot by demonstrating they have a modicum of support.

■ ¶ 24 In addressing OSEB's second justification, we are mindful that a political party is usually a statewide, ongoing organization with distinctive character whose typical goal is to gain control of the machinery of state government by electing its candidates to political office. *Storer v. Brown,* 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974). For this reason, the state has a correspondingly greater interest in imposing restrictions, such as the one in question, in order to provide "assurance that the particular party designation has some meaning." *See Libertarian Party of Florida v. State of Florida,* 710 F.2d 790, 795 (11th Cir.1983), *cert. denied* 469 U.S. 831, 105 S.Ct. 117, 83 L.Ed.2d 60 (1984). As noted above, requiring a political party to show that it has a modicum of support before it is allowed on a general election ballot is a reasonable restriction. Such restrictions not only preserve parties as viable and identifiable interest groups, but also discourage "frivolous" candidates, party raiding, and "sore loser" candidates by spurned contenders.[10] *See Clingman,* 544 U.S. at 581, 125 S.Ct. at 2032 (citing *Nader v. Schaffer,* 417 F.Supp. 837, 845 (D.Conn.1976), *aff'd,* 429 U.S. 989, 97 S.Ct. 516, 50 L.Ed.2d 602 (1976), and *Storer v. Brown,* 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974)).

¶ 25 While a realistic assessment of any ballot access provision must usually be made within the context of the cumulative effect of the state's overall election scheme, LPO has presented virtually no evidence indicating how this statute operates in tandem with other laws in a manner that is unconstitutionally restrictive. Thus, we have primarily

---

10. Although courts have uniformly accepted such justifications as legitimate state concerns, other writers have not been so convinced. Professor Gary Allison argues that party raiding may not even occur, and concerns about "sore loser" candidates are not valid. He argues that a more

open and multi-party system of elections would bring greater stability to government rather than less. *See* Gary D. Allison, *Protecting our Nation's Political Duopoly: The Supremes Spoil the Libertarians' Party,* 41 Tulsa L.Rev. 291–340 (2005).

confined our inquiry to balancing the impact of the questioned law upon associational rights with the state's interest in orderly elections. That analysis leads us to the same conclusion as the Tenth Circuit. Title 26 O.S. Supp.2006 § 1–108 does not unnecessarily restrict or infringe upon the associational rights of Plaintiffs, and is reasonable and justified by legitimate state interests. For these reasons, § 1–108 does not violate Plaintiffs' rights under the Oklahoma or U.S. Constitutions.

## CONCLUSION

¶ 26 Accordingly, the trial court's order denying Plaintiffs' request for a declaratory judgment declaring such statutes invalid is AFFIRMED.

REIF, J., and GOODMAN, J., concur.