**PUBLISHED**

Filed: December 20, 2007

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

LARRY MILLER; 11TH SENATORIAL
DISTRICT REPUBLICAN COMMITTEE,
              *Plaintiffs-Appellees,*

v.

JEAN CUNNINGHAM, in her official
capacity as Chairman of the
Virginia State Board of Elections;
HAROLD PYON, in his official
capacity as Vice-Chairman of the
Virginia State Board of Elections;
NANCY RODRIQUES, in her official
capacity as Secretary of the Virginia
State Board of Elections,
              *Defendants-Appellants.*

No. 06-2334

REPUBLICAN PARTY OF VIRGINIA,
      *Amicus Supporting Appellees.*

LARRY MILLER; 11TH SENATORIAL
DISTRICT REPUBLICAN COMMITTEE,
              *Plaintiffs-Appellants,*

                    v.

JEAN CUNNINGHAM, in her official
capacity as Chairman of the
Virginia State Board of Elections;
HAROLD PYON, in his official
capacity as Vice-Chairman of the        No. 07-1002
Virginia State Board of Elections;
NANCY RODRIQUES, in her official
capacity as Secretary of the Virginia
State Board of Elections,
              *Defendants-Appellees.*

REPUBLICAN PARTY OF VIRGINIA,
      *Amicus Supporting Appellants.*

---

**ORDER**

---

Appellants/cross-appellees filed a petition for rehearing and rehearing en banc. Appellees/cross-appellants filed a response in opposition to the petition.

A member of the Court requested a poll on the petition for rehearing en banc. The poll failed to produce a majority of the judges in active service in favor of rehearing en banc. Judges Wilkinson and Shedd voted to grant rehearing en banc. Chief Judge Williams and Judges Niemeyer, Michael, Motz, Traxler, King, and Duncan voted to deny rehearing en banc. Judge Gregory did not participate in any consideration of this case.

The Court denies the petition for rehearing and rehearing en banc. Judge Wilkinson filed an opinion dissenting from the denial of rehearing en banc.

Entered at the direction of Senior Judge Wilkins for the Court.

FOR THE COURT,

/s/ Patricia S. Connor
Clerk

WILKINSON, Circuit Judge, dissenting from the denial of the petition for rehearing *en banc*:

The panel opinion is by its own admission narrow. It declares Virginia's open primary law unconstitutional solely "'as applied to the narrow facts of this case.'" *See Miller v. Brown*, 503 F.3d 360, 368 (4th Cir. 2007) (citing *Miller v. Brown*, 465 F. Supp. 2d 584, 595 (E.D. Va. 2006)). Appellee contends these facts are "very specific" — constitutional infirmity exists only when, as here, "an incumbent legislator has exercised his prerogative to select an open primary . . . against the wishes of his local party as a whole." *Brief in Opposition to Reh'g* at 3. This means, argues the appellee, that the panel opinion will not apply "in elections with no incumbent, in elections where the incumbent chooses a method of renomination other than primary, and in elections where the local party and the incumbent agree on the method of renomination." *Id.* at 4. Presumably, the panel opinion will also not apply in elections where the incumbent declines to exercise the power to select the method of renomination.

I respect the panel's desire to write narrowly. Narrow rulings have much to commend them as a general matter, particularly in the constitutional context. They ensure that broad judicial decisions do not over-constitutionalize the most fundamental and difficult questions facing our society, leaving these "issues open for democratic deliberation." Cass R. Sunstein, *The Supreme Court, 1995 Term — Foreword: Leaving Things Undecided*, 110 Harv. L. Rev. 4, 7 (1996). Narrow rulings are therefore seldom reason for this circuit to convene *en banc. See Brief in Opposition to Reh'g* at 4 ("Simply put, given the

very limited fact scenario to which the challenged portion of the panel's decision applies, this is not a case of exceptional importance.").

But in the area of election law, a narrow ruling can sometimes be a real mistake. Political campaigns require substantial planning, and participants in the political process must be able to rely on firmly established legal standards. *See* Sunstein, *supra*, at 29 (arguing that decisional minimalism may be a "large mistake" when planning is necessary). The very least courts owe those who hold and seek public office is a clear understanding of the ground rules by which they must compete. Courts, of course, do not establish all of these ground rules, but to the degree we set forth constitutional standards we must not create uncertainty.

Notwithstanding its thoughtful decision in this case, the panel risks leaving Virginia election law in limbo for some time by declining to address what I believe are two fairly presented and important issues: (1) the constitutionality of Virginia's incumbent selection provision, Va. Code Ann. § 24.2-509(B) (2006), and (2) the constitutionality of open primaries, when not selected by an incumbent, *see id.* § 24.2-530. While the majority winks and nods at these broader questions, by its own terms it leaves them unaddressed. This is a mistake. These questions must assuredly be litigated and it is not right to kick the can down the road when those seeking elective office deserve explicit guidance from the courts on electoral conduct.

I.

A.

A brief overview is in order. Virginia law allows political parties to nominate their candidates not only by primary, but also by "methods other than a primary." Va. Code Ann. § 24.2-510 (2006). These other methods "include (but are not limited to) a party convention; a mass meeting, also known as a 'caucus'; and a party canvass or unassembled caucus, also called a 'firehouse primary.'" *Miller v. Brown*, 503 F.3d 360, 362 (4th Cir. 2007) (internal citation omitted). Primaries are conducted and paid for by the state, *see id.*, and must comport with Virginia's "open primary" law, which provides: "All

persons qualified to vote . . . may vote at the primary. No person shall vote for the candidates of more than one party." Va. Code Ann. at § 24.2-530 (2006). Political parties must conduct and fund the other nomination procedures themselves, *see Miller*, 503 F.3d at 362, and are allowed to limit participation, so long as they do so constitutionally. *See, e.g.*, *Smith v. Allwright*, 321 U.S. 649 (1944).

Virginia law vests the power to decide "the method" of making party nominations with the "duly constituted authorities of [a] political party." Va. Code Ann. § 24.2-509(A) (2006). However, there is an exception to this rule: certain incumbent officeholders, including incumbent state legislators — and not the leadership of the party they represent — are allowed to select the method of nomination for their seats. *Id*. § 24.2-509(B);[1] *see also Miller*, 503 F.3d at 362 (noting that

---

[1]This statutory provision reads in full:

Notwithstanding [the party's authority to select the method of renomination], the following provisions shall apply to the determination of the method of making party nominations. A party shall nominate its candidate for election for a General Assembly district where there is only one incumbent of that party for the district by the method designated by that incumbent, or absent any designation by him by the method of nomination determined by the party. A party shall nominate its candidates for election for a General Assembly district where there is more than one incumbent of that party for the district by a primary unless all the incumbents consent to a different method of nomination. A party, whose candidate at the immediately preceding election for a particular office other than the General Assembly (i) was nominated by a primary or filed for a primary but was not opposed and (ii) was elected at the general election, shall nominate a candidate for the next election for that office by a primary unless all incumbents of that party for that office consent to a different method.

When, under any of the foregoing provisions, no incumbents offer as candidates for reelection to the same office, the method of nomination shall be determined by the political party.

For the purposes of this subsection, any officeholder who offers for reelection to the same office shall be deemed an incumbent notwithstanding that the district which he represents differs in part from that for which he offers for election.

Va. Code. Ann. § 24.2-509(B) (2006).

"an incumbent state legislator is entitled to select the method of nomination for his seat").

## B.

In this case, Stephen Martin, a Republican representing the 11th District in the Senate of Virginia, exercised his statutory authority under § 24.2-509(B) to designate a state-funded primary as the method of nomination for his seat. Senator Martin's selection conflicted, however, with the plans of the 11th District Republican Committee ("Committee"). Contrary to the dictate of Virginia's open primary law, the Committee wanted to exclude voters from the nomination process who had voted in recent Democratic primaries. The Committee thus filed a § 1983 suit in federal court, arguing that Virginia's open primary law violated the Committee's First and Fourteenth Amendment rights to free association.

Affirming the district court, a panel of this court agreed with the Committee. Confining its decision to "'the narrow facts of this case,'" *Miller*, 503 F.3d at 368 (citing *Miller v. Brown*, 465 F. Supp. 2d 584, 595 (E.D. Va. 2006)), the panel declared Virginia's open primary law, § 24.2-530, unconstitutional, but only "as applied" to the situation in which an incumbent elects to hold an open primary against his party's wishes, *Miller*, 503 F.3d at 371.

In reaching its decision, the panel declined to consider two properly presented questions: the constitutionality of Virginia's incumbent selection provision, § 24.2-509(B), and the constitutionality of Virginia's open primary law, § 24.2-530, when not selected by an incumbent. For the reasons mentioned earlier in this opinion, I think it was error for the panel to leave unanswered these two questions of exceptional importance. The basic thing judges with life tenure owe elected officials of periodic tenure is clarity on the rules of their contest. I cannot predict whether my distinguished colleagues on this court will or will not adopt at some later point the specific views expressed herein. But I am of firm conviction that two issues critical to Virginia election law are clearly presented by this case, and that it is the solemn obligation of the court to address them.

## II.

The first important issue not addressed by the panel opinion is the constitutionality of Virginia's incumbent selection provision, Va. Code Ann. § 24.2-509(B) (2006). To me, the unconstitutionality of this provision is clear. I fully recognize that governance is an immensely complicated business and that the ability of parties to re-nominate and electorates to re-elect incumbent officeholders is essential to the fund of experience and expertise that enables a large Commonwealth such as Virginia to be well-run. Notwithstanding the benefits that length of service confers upon the public welfare, the incumbent selection provision at issue here facially discriminates in favor of incumbents, shutting down the political process and violating the most essential requirements of equal protection. Moreover, the provision also contravenes the First and Fourteenth Amendment rights of political parties to free association.

I believe that the constitutionality of § 24.2-509(B) is properly presented in this case: the parties are treating it as such, and the panel necessarily considered the provision in reaching its holding. However, failure to address the constitutionality of this provision can only mean more litigation down the road. I see no reason to refrain from striking down a provision that plainly runs afoul of our most fundamental constitutional rights.

## A.

I start my analysis of Virginia's incumbent selection provision with a very simple proposition: if there is going to be election law, it will be written and enacted by incumbents. Both the United States and Virginia Constitutions explicitly grant the legislative branch the authority to regulate elections. The Federal Constitution states that "Congress may at any time make or alter . . . regulations" governing "the times, places, and manner of holding elections for Senators and Representatives," U.S. Const. art. I, § 4, while the Virginia Constitution grants Virginia's legislature broad powers to control nearly all facets of the electoral process:

> The General Assembly shall provide for the nomination of candidates, shall regulate the time, place, manner, conduct,

and administration of primary, general, and special elec-
tions, and shall have the power to make any other law regu-
lating elections not inconsistent with this Constitution.

Va. Const. art. II, § 4.

Given this, there is certainly nothing unconstitutional *per se* about
incumbents shaping the electoral process to their advantage. This is
merely a feature of American politics. The Framers were surely aware
of the desire of those who hold elective office to retain elective office,
yet they were clearly comfortable giving incumbents the authority to
write election law. Judicial intervention into the electoral process,
merely for the purpose of rooting out self-interested political behav-
ior, would therefore be an "substantial" incursion into textually and
traditionally legislative prerogatives.[2] *See Vieth v. Jubelirer*, 541 U.S.
267, 306 (2004) (Kennedy, J., concurring in the judgment). Further-
more, elections are "pervasively regulated," Richard H. Pildes, *The
Supreme Court, 2003 Term — Foreword: The Constitutionalization
of Democratic Politics*, 118 Harv. L. Rev. 28, 51 (2004), and aggres-
sive review of legislative motivation in this area would leave the fed-
eral judiciary time to do little else but analyze election laws. The
Supreme Court has therefore been appropriately reluctant to police

---

[2]Of course, the Supreme Court has struck down election laws for other
reasons. *See, e.g.*, *Randall v. Sorrell*, 126 S. Ct. 2479 (2006) (striking
down Vermont's campaign finance laws for violating the First Amend-
ment right to free speech); *Harper v. Va. Bd. of Elections*, 383 U.S. 663,
666 (1966) (striking down Virginia's poll tax for unconstitutionally con-
ditioning the fundamental right to vote on "the affluence of the voter or
payment of any fee"); *Smith v. Allwright*, 321 U.S. 649 (1944) (striking
down a law that allowed the state Democratic Party to enforce its rule
requiring all voters in a primary to be white).

In reaching these decisions, the Court has, at times, discussed the fact
that election laws may serve to insulate incumbents from competition.
*See, e.g.*, *Randall*, 126 S. Ct. at 2492 ("That is because contribution lim-
its that are too low can also harm the electoral process by preventing
challengers from mounting effective campaigns against incumbent
officeholders, thereby reducing democratic accountability."). In these
cases, however, the Court was discussing the self-interested nature of the
election law in the context of otherwise unconstitutional behavior, not as
the primary reason for striking the legislative action.

enactments in the election law context, even while explicitly recognizing that self-interest may be a partial driver of legislative action in this area. *See Vieth*, 541 U.S. at 298, 305 (plurality opinion) (holding political gerrymandering to be non-justiciable for lack of a judicially manageable standard despite the fact that redistricting is always conducted with an intent to gain "political advantage").

Nonetheless, there are limits to this deference. As the Supreme Court suggested in the famous fourth footnote of *United States v. Carolene Products Co.*, 304 U.S. 144 (1938), the judiciary has a basic obligation to keep the political process open and well-functioning. *See id.* at 152 n.4. "The first instinct of power is the retention of power," and those who hold public office can be expected to attempt to insulate themselves from meaningful electoral review. *McConnell v. FEC*, 540 U.S. 93, 263 (2003) (Scalia, J., concurring in part and dissenting in part). It is therefore necessary for an independent and co-equal branch of government — the judiciary — to ensure that incumbents are unable to create a system where the "ins . . . will stay in and the outs will stay out." John Hart Ely, *Democracy and Distrust* 103 (1980); *see also* Michael J. Klarman, *Majoritarian Judicial Review: The Entrenchment Problem*, 85 Geo. L.J. 491, 497-502 (1997).

This is because any political system that lacks accountability, "democracy's essential minimal condition," Pildes, *supra*, at 44, does not conform with even the barest requirements of equal protection, which demand, at a minimum, that the majority is not systematically frustrated in enacting its policies into law. *See Lucas v. Forty-Fourth General Assembly*, 377 U.S. 713, 753-54 (1964) (Stewart, J., dissenting) (stating that legislative action which causes "systematic frustration" of the majority will does not meet the "basic" requirements of equal protection); *see also Reynolds v. Sims*, 377 U.S. 533, 565 (1964) (stating that "[f]ull and effective participation by all citizens in state government requires . . . that each citizen have an equally effective voice in the election of members of his state legislature"); *Baker v. Carr*, 369 U.S. 186, 261-62 (1962) (Clark, J., concurring).

At the very least, therefore, the need to "clear the channels of political change," *see* Ely, *supra*, at 105-34, requires the judiciary to presume that election laws that *facially* discriminate in *favor* of

incumbents are unconstitutional.[3] Two reasons support this conclusion. First, election laws that facially discriminate in favor of existing officeholders simply go "too far": if incumbents are allowed to pass laws explicitly and exclusively for their own benefit, there would be no end to the advantages they could provide themselves. Incumbents could therefore diminish the possibility for change and competition in American politics to a degree never envisioned by the Constitution. Second, the problems presented by judicial intervention into the political process are not nearly as pronounced when the courts are faced with laws that facially favor incumbents. Facially neutral laws, like legislative redistricting schemes, may produce a *de facto* advantage for incumbents, but uncovering whether that advantage reaches unconstitutional limits requires an intrusive — and potentially error-prone — inquiry into legislative motive. The biases of facially discriminatory laws, on the other hand, are readily apparent.

Given the foregoing, Virginia's incumbent selection statute, Va. Code Ann. § 24.2-509(B) (2006), is plainly unconstitutional, at least when state legislators are passing laws dealing with their own re-election prospects. The statute facially discriminates in favor of existing officeholders, by compelling political parties to "nominate [their] candidate[s] for election . . . by the method[s] designated" by incumbents. In doing so, the law leaves no doubt as to who its purported beneficiaries are — the incumbents in Virginia's General Assembly. These incumbent legislators already possess numerous structural advantages over their electoral competition: money, name-recognition, staff, etc. To this pre-existing array of *de facto* advantages, Virginia's incumbent selection provision now adds the *de jure* advantage that the incumbent can dictate his or her recommended preference as to renomination procedures over a party's express wishes. Such an explicit advantage given to existing officeholders

---

[3]Laws may, of course, facially benefit incumbents without posing constitutional problems. For example, laws that enable state legislators to provide constituent services — e.g., hire staff, *see* Va. Code Ann. § 30-19.4 (2004), or pay office expenses, *see id.* at § 30-19.14 — are clearly constitutional, despite the fact that these statutes may provide resources that produce a *de facto* advantage for legislators in campaigning for reelection. But these laws are clearly passed for a legitimate purpose, unlike election laws passed solely to entrench incumbents in office.

surely threatens to entrench Virginia's incumbents to an unconstitutional extent.

In *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 837-38 (1995), the Supreme Court held that a state cannot place term limits on its United States Congressmen. *Thornton*, however, left intact the option of states to impose term limits on state legislators. Virginia has declined to impose such limits, and it may well be wise and correct in declining to do so. Nonetheless, the basic *quid pro quo* implied by *Thornton* maintains its force: the federal courts will ensure that constitutionally qualified candidates are not prevented from seeking office, so long as those candidates do not shut down the political process and entrench themselves once they are elected. By facially favoring current officeholders, Virginia's incumbent selection provision violates the mandate of this *quid pro quo*, and threatens the "fundamental principle of our representative democracy," that "'the people should choose whom they please to govern them.'" *Powell v. McCormack*, 395 U.S. 486, 547 (1969) (quoting 2 *Elliot's Debates* 257 (A. Hamilton, New York)).

### B.

The constitutional infirmity of Virginia's incumbent selection provision does not end with its explicit discrimination in favor of existing officeholders. While this alone is sufficient to render Va. Code Ann. § 24.2-509(B) unconstitutional, the provision additionally contravenes the First and Fourteenth Amendment rights of political parties to free association.

The Supreme Court has long recognized that the First Amendment protects "the freedom to join together in furtherance of common political beliefs." *Tashjian v. Republican Party of Connecticut*, 479 U.S. 208, 214 (1986). A fundamental and necessary element of this freedom is the ability of a political party to make its own decisions: "'Freedom of association would prove an empty guarantee if associations could not limit control over their decisions to those who share the interests and persuasions that underlie the association's being.'" *Democratic Party of United States v. Wisconsin ex rel. La Follette*, 450 U.S. 107, 122 n.22 (1981) (quoting Laurence H. Tribe, *American Constitutional Law* 791 (1978)). Of particular importance are a politi-

cal party's decisions surrounding the process of selecting its nominee, for a "party's choice of a candidate is the most effective way in which that party can communicate to the voters what the party represents and, thereby, attract voter interest and support." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 372 (1997) (Stevens, J., dissenting).

In allowing the views of a single individual to override the wishes of an entire political party, Virginia's incumbent selection mechanism fails to abide by even these basic First Amendment requirements. As the panel correctly recognized, the incumbent is not the party, nor even the designated representative of the party. *Miller v. Brown*, 503 F.3d 360, 368-70 (4th Cir. 2007). In fact, the incumbent and the party face very different incentives with regard to the selection of nominating procedures. *Id.* at 369; *see also Eu v. San Francisco County Democratic Cent. Comm.*, 489 U.S. 214, 225 n.15 (1989) ("Simply because a legislator belongs to a political party does not make her at all times a representative of party interests."). The incumbent will focus primarily on his or her chances for re-election, while the party may have multi-faceted goals that are not necessarily best achieved by maximizing a particular individual's re-electability. Allowing the incumbent to bind a party despite these differences — without the party's explicit or implicit consent — is the very definition of an unconstitutional burden on the party's associative rights, and a sufficient reason, in and of itself, to declare Va. Code Ann. § 24.2-509(B) unconstitutional.

### C.

Finally, I note that it is entirely proper for us to consider the constitutionality of the incumbent selection provision in this litigation. For three reasons, I think this question is squarely presented.

First, the parties are treating it as such. The state has vigorously argued that the incumbent *is* the party, placing the incumbent selection provision directly in front of this court. *See Miller*, 503 F.3d at 368-70 (noting that the Board's challenge to the district court ruling rested on an argument that the incumbent's selection of an open primary did not burden the Republican Party's interests). Indeed, the panel discussed Va. Code Ann. § 24.2-509(B) at length in its opinion.

*See id.* at 369-70. It is difficult to see how judicial economy is served by a court considering such an obviously unconstitutional provision without ruling on its constitutionality.

Second, it is impossible to consider Virginia's open primary law on the facts of this case without also evaluating the incumbent selection provision. The constitutionality of an open primary — or any other nomination option — is inextricably linked to the manner in which a state designates those options may be chosen. Therefore, we must consider the two provisions in concert. Indeed, as the panel recognized in limiting its decision to the "specific" circumstance where "an incumbent legislator has exercised his prerogative to select an open primary . . . against the wishes of his local party as a whole," *Brief in Opposition to Reh'g* at 3, one cannot consider *what* was chosen without asking *how* and *by whom* it was chosen.

Third, leaving the incumbent selection provision largely intact almost certainly ensures further litigation down the road. The minute an incumbent chooses to run, for example, a convention or closed primary against his or her party's wishes, the party will challenge the law, claiming that its associative rights have been violated. To repeat: clarity is a critical component of election law — a particularly litigious field — and this question should simply not be left hanging. It is not a matter for another day.

## III.

The second important issue not addressed by the panel is the constitutionality of Virginia's open primary law, Va. Code Ann. § 24.2-530 (2006), when it is not triggered by the incumbent selection mechanism. The panel explicitly reserves this question in its opinion: "we do not decide whether the open primary statute, viewed in isolation, impermissibly burdens a political party's associational rights." *Miller v. Brown*, 503 F.3d 360, 366 n.6 (4th Cir. 2007). Later, to emphasize its point, the panel explicitly reserves the question again: "[h]ere, we need not decide whether Virginia's open primary statute, viewed in isolation, impermissibly burdens a political party's right to associate with those who share its beliefs." *Id.* at 367. Reading the panel's rejection of the Committee's facial challenge to open primaries, one may conclude that state-mandated open primaries are constitutional.

*Id.* at 364-68. Conversely, in striking Virginia's open primary law as applied to an incumbent-selected primary, the panel sets up a most peculiar system in which an incumbent is free to impose on his party any nomination mechanism he chooses — convention, caucus, fire-house primary, closed primary — except that he cannot choose a state-funded open primary over his party's veto. *Id.* at 368-71. This decision may be construed as mandating a constitutional preference for closed primaries — a dramatic step certainly not dictated by Supreme Court precedent.

To repeat once more: clarity in election law is critically important, and the implications of the panel's decision are not clear. The consequences of this lack of clarity are considerable in this case: to the extent the panel calls into question the constitutionality of open primaries, the panel not only discourages state legislatures from making a choice that they are perfectly entitled to make, but it also nudges Virginia down the road to party registration, something the state has yet to adopt. Thus, the panel opinion threatens to remove legitimate options as to party nomination mechanisms from the people themselves and enshrine a principle of political polarization in constitutional law. The panel could and should have made clear that a state law mandating open primaries, through something other than an incumbent selection provision, is perfectly constitutional. To say that this question must await further litigation is to do the Commonwealth a considerable disservice.

## A.

A mandatory open primary should indeed be a constitutional choice for states to make. Not the only choice by any means, or necessarily the best, but a permissible one.

In *Democratic Party of United States v. Wisconsin ex rel. La Follette*, 450 U.S. 107, 120-24 (1981), the Court invalidated Wisconsin's selection of its presidential delegation by open primary because it conflicted with the national Democratic Party's rules for seating delegates and thus infringed the national party's associational rights. The Court did not consider the constitutionality of state open primaries generally — except to observe that "the Wisconsin Supreme Court

may well [have] be[en] correct" to uphold the Wisconsin open primary law as constitutionally valid. *Id.* at 121.

In *Tashjian v. Republican Party of Connecticut*, 479 U.S. 208, 225 (1986), the Supreme Court invalidated a state-imposed closed primary that disallowed participation of registered independents, where such a primary conflicted with party rules. The Supreme Court noted, "[t]he relative merits of closed and open primaries have been the subject of substantial debate since the beginning of this century, and no consensus has as yet emerged." *Id.* at 222. The Court went on to enumerate the states that mandated open primaries by statute. *Id.* at 222 n.11. These observations hardly suggest that the open primary option is constitutionally foreclosed. To the contrary, they suggest that the "relative merits" of open primaries are a matter for each state to consider.

In *California Democratic Party v. Jones*, 530 U.S. 567, 586 (2000), the Supreme Court invalidated California's mandatory blanket primary. The blanket primary placed all the candidates on one ballot and allowed all registered voters, regardless of their party registration, to vote for any candidate in any race, such that one individual could cast votes for candidates from different parties in different races. *Id.* at 570. The top vote-getter of each party became the nominee of that party for the general election. *Id.* The Court invalidated the California system. In doing so, however, it expressly observed that "the blanket primary . . . may be constitutionally distinct from the open primary." *Id.* at 577 n.8. The Supreme Court distinguished open primaries in *Jones* for one simple reason: open primaries do not impose an impermissible burden on parties' constitutional rights.

Unlike the blanket primary in *Jones*, an open primary does not force a party to allow nonmembers to participate. *See id.* at 577, 581. Instead, an open primary creates an affiliation between voter and party on the day of the election, when the voter chooses to participate in one party's primary to the exclusion of all others. In this respect, it is much more akin to a constitutionally permissible closed primary than an unconstitutional blanket primary. In *Jones*, the Court said a closed primary is "qualitatively different" from a blanket primary. *Id.* at 577. "Under [a closed primary] system, even when it is made quite easy for a voter to change his party affiliation the day of the primary,

and thus, in some sense, to 'cross over,' at least he must formally become a member of the party; and once he does so, he is limited to voting for candidates of that party." *Id.* (emphasis omitted).

But this seems no "qualitatively different" from what an open primary does: it allows voters to change their party affiliation on the day of the election and limits each voter's participation to *one party's primary*. Just as in some closed party systems, members can affiliate with the party as late as the day of the election. And, as in closed primaries, an important sign of affiliation is voting *exclusively* in one party's primary. Constitutionally speaking, an open primary functions the same way as a closed primary with same-day registration. *See id.*

It is no answer to say that a closed primary requires formal party registration and an open primary does not. The act of voting exclusively in one party's primary is itself an act of affiliation. As the Court noted in *Jones*, "[t]he act of voting in the [party] primary fairly can be described as an act of affiliation with the [party]." *Id.* at 577 n.8 (quoting *La Follette*, 450 U.S. at 130 n.2 (Powell, J., dissenting)).

The importance of voting as an act of affiliation is only underscored in Virginia, where the act of voting is the only act of affiliation recognized by state law. Virginia law, as noted, does not provide a mechanism for party registration. Presenting oneself on election day and asking for a particular party's ballot is thus not just *a* declaration of affiliation — it is the *only* declaration of affiliation contemplated by Virginia law. In this, Virginia has chosen to recognize that "[t]he act of casting a ballot in a given primary may, for both the voter and the party, constitute a form of association that is at least as important as the act of registering." *Clingman v. Beaver*, 544 U.S. 581, 601 (2005) (O'Connor, J., concurring in part & concurring in the judgment).[4]

---

[4]It is no objection that Virginia law allows the state, rather than the party, to decide who is a "member" of the party for purposes of the primary. Practically every primary system gives the state some say over who is a "member" for purposes of voting in a state-run primary. For example, the state may require party registration for a reasonable period of time before a primary election. *See Rosario v. Rockefeller*, 410 U.S. 752, 760 (1973) (eleven month waiting period for nonpresidential primary reasonable). Under such a system, the party cannot choose to allow

In *Jones*, the Court showed keen awareness of such electoral nuances. It characterized its holding as striking a primary that was open "to persons *wholly* unaffiliated with the party," 530 U.S. at 581 (emphasis added), to "those who, at best, have refused to affiliate with the party, and, at worst, have expressly affiliated with a rival," *id.* at 577. It distinguished between the California blanket primary — which allowed voters who were formally registered with other parties to vote in any party's primary in each individual race — and open and closed primaries, which require exclusive party affiliation. *Id.* at 577 & n.8.

Thus an open primary imposes no unconstitutionally severe burden on parties' associational rights. In rejecting a facial challenge to Virginia's open primary law, the panel may be suggesting exactly this: that state-mandated open primaries are constitutional. *See Miller*, 503 F.3d at 364-68. In deciding the as-applied challenge, the panel might be taken to imply just the opposite: that closed primaries are constitutionally permissible choices and open primaries are not. *Id.* at 368-71. Any such implication is a grave one: it may discourage state legislators from mandating open primaries — a constitutional option — and it may make the Virginia legislature feel more compelled to require party registration. While such a step may or may not be desirable, it is not constitutionally required. To repeat: clarity is exceptionally important in election law, and the panel opinion's lack of clarity on this critically important point may throw into question the right of the people of Virginia and other states to exercise the option of encouraging open political party nomination contests that may attract new voters to a party. This is a shame. Legislators, candidates, and voters in Virginia deserve more than unanswered questions.

---

"members" who have been registered for a shorter period to vote in the primary, no matter how much the party may desire it. Alternatively, the state may allow party registration on the very day of the election, *see Jones*, 530 U.S. at 577, and the party may not turn away those who follow the law. If this poses any associational burden at all on the wishes of the party, the Court suggested in *Jones* that it is not an unconstitutional one. *See id.* It is far from clear to me that the Virginia open primary poses any *more* of an associational burden than a system such as this.

B.

The panel does imply that a mandatory open primary may be con-stitutionally problematic by dismissing the state's asserted interests in support of it. *See Miller*, 503 F.3d at 370-71. The panel may believe it rejects these interests on the basis of *Jones*, but applying language from *Jones* to a type of primary that *Jones* expressly distinguished is a complete transposition of context. A state interest that may be insuf-ficient to uphold one type of primary may be sufficient with regard to an entirely different type where the burden on parties' associative interests is concededly less severe. The panel regrettably gives short shrift to important state interests that underlie the open primary tradi-tion.

First, by not requiring formal party registration, Virginia has made an administrative choice squarely within its power over its election process. *See, e.g.*, *Burdick v. Takushi*, 504 U.S. 428, 433 (1992); *Rosario v. Rockefeller*, 410 U.S. 752, 760 (1973). The state may make the reasonable decision not to track party affiliations as part of the voter registration process for any number of reasons, the least of which is simple ease and efficiency. Conversely, political parties do not have a constitutional right to demand that the state require formal party declarations of all registered voters. To accommodate the Republican Party's demands, as expounded here, would appear to entail striking and replacing portions of Virginia's neutrally formu-lated voter registration apparatus.

Second, by not requiring formal and public declarations of party affiliation, the state has chosen to protect its voters' privacy interests. While the Supreme Court in *Jones* suggested that this interest might not in all cases be compelling, it remains a permissible interest, and in some cases a compelling one. Meanwhile, adoption of the Republi-can Party Plan, at least the proposal set forth in this case, would run roughshod over voters' privacy interests, requiring either the Party or the state to inquire into voters' five-year voting histories.

Relatedly, Virginia may also choose to protect its voters' ability to change party affiliations with minimal interference from the state. This is not an instance of the state impermissibly privileging a "non-member's desire to participate in [a] party's affairs" over the "right

of the party to determine its own membership qualifications." *Jones*, 530 U.S. at 583 (quoting *Tashjian*, 479 U.S. at 215 n.6). It is an instance of the state protecting voters' ability to become members of the party to whose views they sincerely ascribe.

The Supreme Court has held that states may within constitutional limits make it more difficult for individuals to change party affiliation. *See Rosario*, 410 U.S. at 760 (state requiring party registration eleven months before nonpresidential primary reasonable). But it has never held that a state may not make party affiliation easier. In fact, it has struck some state impediments to party affiliation as impermissibly infringing voters' "constitutional freedom to associate with the political party of their choice." *See Kusper v. Pontikes*, 414 U.S. 51, 61 (1973) (state law requiring party registration twenty-three months before primary infringed voters' constitutional freedom). As noted in *Jones*, a state that requires formal party registration may constitutionally allow changes in registration on the day of the election, *see* 530 U.S. at 577, thus achieving the same protection of voters' interests as Virginia's system. Given issues of war and peace, economic up and downturns, tax policy and spending priorities, not to mention issues with intense appeal to particular groups of citizens, voters may well want to rethink their party affiliations. The Virginia system gives them a chance to do so.

Finally, Virginia's open primary law promotes the state's interest in encouraging voter participation. An open primary in this sense reflects a century of efforts among states — not always willingly undertaken — to expand the franchise and ballot access. The Court has recognized that "[t]he right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964). It has taken states to task for policies that limited the choices voters had in casting their ballots. *See, e.g.*, *Bullock v. Carter*, 405 U.S. 134 (1972); *Williams v. Rhodes*, 393 U.S. 23 (1968); *Harper v. Va. Bd. of Elections*, 383 U.S. 663 (1966). These decisions suggest that states labor under a duty to expand participation, not to restrict it.

## C.

I emphasize these points not merely in defense of the constitutionality of Virginia's open primary law, but because the implications of

proscribing all states from ever prescribing open primaries could not be more profound. To the extent the panel's position is interpreted to draw into question open primaries, it threatens to push American politics into a one-size-fits-all direction. If the panel's rejection of the Committee's facial challenge to open primaries is taken to be its holding, that will be all to the good. If the panel's as applied holding is taken to imply that a mandatory open primary law would impose a severe burden on a party's associational rights, that will be a loss. In fact, a constitutional ban on open primary laws such as Virginia's would be just one more small step in making ours an ever more divided country.

The truth is there is much to be said for a variety of models of party registration and primary organization. Our federal system protects this flexibility. It reposes in state legislatures a traditional and historical power to choose between forms of primaries, between voter registration by party and not. Options are indicative of the diversity of American politics in which one size does not fit all, and in which state electoral laws (on voter registration, primary dates, third-party ballot eligibility, etc.) have never been thought to constrict the ongoing experimentation that is American democracy.

Traditionally, states have been able to shape the details of their own democratic experiment. They could, for example, choose to require party registration eleven months prior to an election, or thirty days prior, or not at all. *See, e.g.*, *Rosario*, 410 U.S. at 760. By requiring advance registration and restricting primary participation to such voters, states may adopt a model of candidate selection which maximizes the power of a party's core adherents or "base." Base politics has much to commend it. It develops core principles and crystallizes issues, and it can serve to clarify differences and sharpen the edges of partisan debate. And party partisanship is hardly a bad thing; indeed it underlies the vigor and vitality of our political life.

But the model of base politics is not the only one, nor has the American political tradition ever declared that it is. A state may conclude that the nominating process should leave room for less fervently committed partisans to have some say. A state may conclude that an open primary leads to a more participatory election. A state may conclude that an open primary leads candidates to make more moderate

and broad-based appeals. A state may conclude that an open primary better serves the needs of its voters, who may respond to the ever-changing political scene with a sincere desire to change their party affiliation. An open primary encourages parties to be evolutionary instruments, rather than static ones. And it encourages potential voters to look at parties anew.

There is no one answer to this closed versus open primary debate, and the Constitution should not seek to impose one now and for all time. Rather, there are good reasons to leave our state legislatures with this flexibility. Elections are events of public import and do not warrant the exclusion of the judgment of elected representatives. State legislators, moreover, represent the political parties themselves, and there is no danger they will leave party politics, the very soil that has nurtured them, to wither on the vine.

Virginia's preference for state-funded open primaries is not unique. A number of states mandate open primaries. *See, e.g.*, Haw. Rev. Stat. § 12-31; Idaho Code §§ 34-402, 34-404, 34-904; Mich. Comp. Laws § 168.576; Minn. Stat. § 204D.08; Mo. Rev. Stat. § 115.397; Mont. Code Ann. § 13-10-301; N.D. Cent. Code § 16.1-11-22; Vt. Stat. Ann. tit. 17, § 2363; Wis. Stat. §§ 5.37, 6.80. Still other states conduct primaries with some attributes of open primaries. And even if the number of open primary states had been far fewer, the respect due and owing them would be no less. Nebraska has bucked the national con-sensus on bicameralism, *see* Neb. Const. art. III, § 1; Kentucky, New Jersey, and Virginia elect their governors in odd numbered years, *see* Ky. Const. § 95; N.J. Const. art. XI, § 3; Va. Code Ann. § 24.2-210 (2006). If our federal system stands for anything, it is that the con-trarian spirit of a state must be respected.

If the panel decision should ever be interpreted to call into question the variety of systems at work in our fifty states, its threat to political life as we know it would be severe. Whether the panel intended to take the matter of open primaries out of legislators' hands and place it wholly in those of unelected party officials and unelected judges is unclear, as its disposition of the different challenges before it point in different directions. But if it intended to do so, this would be move-ment in the wrong direction. This would make our public life *less* democratic; not more.

Any reinvention of the right of association to disturb the historic balance and interplay between state laws and party rules, and to undermine the historic diversity of state systems would be unfortunate. The outcome will be the replacement of the diverse electoral systems of our states with a court-dictated approach. The choice between open and closed nominating processes has always been deemed a permissible one for states to make. What now in our present Constitution makes it different today?

In undermining our nation's political diversity, a flat constitutional ban on open primaries would paradoxically risk our unity and give freer rein to polarizing trends in our political life. I do not intend to elaborate on the gerrymandered districts, non-ending election cycles, criminalization of political differences, etc., that observers beyond number have indicated are making common ground less easy to find and fracturing our wholeness as a nation. Such concerns may be alarmist, and yet it would be error to dismiss them out of hand. But these structural developments have at least occurred within the political process itself, and the political process may in time be counted upon to supply a corrective. However, by throwing open primaries into constitutional question, judges are threatening to constitutionalize polarization, for which by definition there is no political remedy. This would enshrine in our founding document a divisive principle for a nation that has suffered too much division already.

The essence of our constitutionalism is that one size does not invariably fit all. That is the whole point of our federal system — to keep different approaches to democratic governance alive. There is no one right answer. At a minimum, courts should not use the American Constitution to weaken the centrist impulses in American politics. It should be clear that an open primary, where candidates must compete for votes beyond their party's core adherents, is a permissible choice for a state to make. To use our unelected powers to foreclose this electoral option would prove the worst of self-inflicted wounds.